UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

|                                    |     |          |
|------------------------------------|-----|----------|
| UNITED STATES OF AMERICA,          | )   |          |
|                                    | )   |          |
| Plaintiff,                         | )   |          |
|                                    | )   |          |
| v.                                 | )   | Case No. |
|                                    | )   |          |
| NORTH EAST MOBILE HEALTH           | )   |          |
| SERVICES,                          | )   |          |
|                                    | )   |          |
| Defendant.                         | )   |          |

## COMPLAINT

NOW COMES Plaintiff, the United States of America (the "United States"), on behalf of

its agency the U.S. Department of Health and Human Services ("HHS"), and hereby files the

instant Complaint against Defendant North East Mobile Health Services ("NEMHS") pursuant to

31 U.S.C. § 3730(a), and in support thereof alleges as follows.

**I.      Summary of Action**

1.      Ambulances are primarily emergency vehicles.  Absent a medical emergency, the

appropriate means to transport a patient is ordinarily by wheelchair van or car.  This general rule

applies to Medicare billing.  A limited exception is available only where a patient is either "bed-

confined" (by virtue of being unable to get up from bed without assistance, walk, and sit in a

chair or wheelchair) and a wheelchair van or car is contraindicated, or a patient's medical

condition otherwise requires an ambulance.  For Medicare billing purposes, ambulance

transports are therefore not covered if some means of transportation other than ambulance could

be used without endangering a patient's health, regardless of whether another means of

transportation is actually available.  In other words, nonemergency ambulance transports of

1

patients who are neither bed-confined nor otherwise medically require an ambulance cannot be billed to Medicare.  Significantly, Medicare does not pay for wheelchair van transports.

2.      NEMHS knowingly disregarded this rule by engaging in a practice of seeking Medicare payments for patients it falsely claimed were either "bed-confined" or for whom transportation by ambulance was not otherwise medically necessary.  At issue here, patients transported to and from Maine Medical Center ("MMC") via NEMHS ambulance were often found walking around their homes or hospital rooms, walked themselves to NEMHS ambulances and then sat down on the stretchers, or were able to sit comfortably in chairs or wheelchairs. NEMHS' contemporaneous records of its ambulance transports demonstrate this.  One patient informed NEMHS that her pain was diminished *upon walking*, and that rest and elevation (*i.e.*, occurring while transported on a stretcher via ambulance) actually made her pain *worse*. Another patient informed NEMHS, following his operation, that "it [was] so much easier to walk around now."  Another patient suggested that walking would be the best way for her to get to her stretcher.  Numerous other patients were found sitting in their hospital chairs comfortably "ready to go" and "able to stand and walk," or were placed in wheelchairs immediately upon arrival at their destinations, but are noted in NEMHS and MMC records as being "bed-confined" or "unable to sit."

3.      NEMHS sought and received funds from Medicare for such false and fraudulent medically unnecessary ambulance transports in numerous instances where patients were not "bed-confined" and did not otherwise require ambulance transportation.  NEMHS knew this.

4.      NEMHS operated out of MMC under a "preferred provider" contract for ambulance transport services, which gave NEMHS initial rights to each MMC transport. Medically unnecessary ambulance rides billed by NEMHS were frequently supported by an

MMC "Ambulance Certification Statement" form—on a template form provided by NEMHS—averring that the unnecessary ambulance transports were medically necessary.  The Ambulance Certification Statements prepared by MMC, also known as physician certification statements, were used by NEMHS to seek and receive Medicare funds for each nonemergency ambulance transport.  These certifications are contradicted not only by the contemporaneous narratives of NEMHS personnel, but also by MMC's medical records.

5.      Additionally, since at least 2012, NEMHS knowingly retained overpayments of Medicare funds to which it was not entitled by failing to report and return such funds within 60 days after the date on which the overpayments were identified.  NEMHS identified such "reverse false claims" by failing to exercise reasonable diligence owing to its lack of compliance activities to monitor the accuracy and appropriateness of its Medicare claims.  NEMHS also specifically identified reverse false claims by determining and quantifying certain overpayments it received on claims.

6.      The instant action accordingly seeks treble damages and civil penalties pursuant to the federal False Claims Act, 31 U.S.C. § 3729, *et seq.*, arising from all false or fraudulent claims submitted by NEMHS to the United States, NEMHS' false records or statements material to such claims, and NEMHS' unlawful retention of Medicare overpayments.

## II.    Jurisdiction and Venue

7.      This Court has jurisdiction over the claims brought by the United States under the False Claims Act pursuant to 28 U.S.C. §§ 1331, 1345, and supplemental jurisdiction to entertain common law and equitable causes of action under 28 U.S.C. § 1367(a) and 31 U.S.C. § 3732(b).

8.      This Court has personal jurisdiction over Defendant pursuant to 31 U.S.C. § 3732(a) both because Defendant can be found in, resides in, or transacts business in this District and because its acts proscribed under 31 U.S.C. § 3729 occurred in this District.

9.      Venue is proper in this District under 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b), 1391(c), because Defendant resides in or transacts business in this District and/or because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## III.    Parties

10.     Plaintiff the United States is acting on behalf of its agency HHS.

11.     Defendant NEMHS, located at 24 Washington Street, Scarborough, Maine, is the largest ambulance service in the state of Maine.  NEMHS is a Maine for-profit business corporation.

## IV.    Applicable Laws & Regulations

### A.      The Medicare Program

12.     Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.*, establishes the Health Insurance for the Aged and Disabled Program, commonly referred to as the Medicare Program (the "Medicare Program" or "Medicare").

13.     Parts A through D comprise the Medicare Program.  At issue in this case is Medicare Part B, which provides federal government funds to help pay for, among other things, ambulance services provided to Medicare beneficiaries.  *See* 42 U.S.C. § 1395m(l); *see generally* 42 U.S.C. §§ 1395j-1395w-4.

14.     Medicare Part B is funded by insurance premiums paid by enrolled Medicare beneficiaries and by contributions from the federal treasury.  Eligible individuals may enroll in

Part B to obtain benefits in return for payments of monthly premiums as established by HHS. *See* 42 U.S.C. §§ 1395o, 1395r.  Medicare payments are often made directly to service providers, such as ambulance services providers, rather than to the patient (also known as the "beneficiary").  This occurs when the provider accepts assignment of the right to payment from the beneficiary.  In such instances the provider submits its bill directly to Medicare for payment, which is what NEMHS did in this case.

15.     Medicare is administered by the Centers for Medicare & Medicaid Services ("CMS"), a sub-agency of HHS.  CMS, in turn, contracts with Medicare Administrative Contractors ("MACs"), which act on CMS' behalf to administer, process, and pay Part B claims from the Medicare Trust Fund.

16.     For example, NEMHS submitted claims to the MAC covering Maine.  For the ambulance transport-related claims at issue in this case the Medicare Program, through the MAC, paid a significant portion of every claim accepted.

17.     In order to bill the Medicare Program with respect to the claims at issue in this case, NEMHS submitted electronic CMS-1500 health insurance claims forms.  With its submission of each such CMS-1500 form, NEMHS certified that the ambulance transport services in question were "medically indicated and necessary for the health of the patient," and stated the procedure(s) for which it was billing Medicare, the identity of the patient, and its provider number.

18.     Because it is not feasible to review medical documentation before paying each claim, MACs generally make payment under Medicare Part B on the basis of the providers' certification included on the Medicare claim form.

19.    All healthcare providers, including ambulance services providers, must comply with applicable federal statutes, regulations and guidelines in order to be paid by Medicare Part B.  A provider has a duty to have knowledge of the statutes, regulations, and guidelines regarding coverage for the Medicare services.

20.    Medicare only pays for services which are "reasonable and necessary for the diagnosis or treatment of illness or injury . . . ."  42 U.S.C. § 1395y(a)(1)(A).

21.    Medicare regulations exclude from payment services that are not reasonable and necessary.  *See* 42 C.F.R. § 411.15(k)(1).

**B.     Medicare Laws Regarding Nonemergency Ambulance Transports**

22.    Medicare specifically provides for coverage of ambulance services only "where the use of other methods of transportation is contraindicated by the individual's condition, but . . . only to the extent provided in regulations."  42 U.S.C. § 1395x(s)(7).

23.    The Medicare regulation for "Coverage of ambulance services" is 42 C.F.R. § 410.40.  This regulation was in force throughout the entirety of NEMHS' conduct at issue in this case.  The regulation defines the "medical necessity requirements" for Medicare-covered ambulance transportation as follows:

> (1) General rule. Medicare covers ambulance services, including fixed wing and rotary wing ambulance services, only if they are furnished to a beneficiary whose medical condition is such that other means of transportation are contraindicated. The beneficiary's condition must require both the ambulance transportation itself and the level of service provided in order for the billed service to be considered medically necessary. Nonemergency transportation by ambulance is appropriate if either: the beneficiary is bed-confined, and it is documented that the beneficiary's condition is such that other methods of transportation are contraindicated; or, if his or her medical condition, regardless of bed confinement, is such that transportation by ambulance is medically required. Thus, bed confinement is not the sole criterion in determining the medical necessity of ambulance transportation. It is one factor that is considered in medical necessity determinations. ***For***

> *a beneficiary to be considered bed-confined, the following criteria must be met:*
>> *(i)  The beneficiary is unable to get up from bed without assistance.*
>> *(ii)  The beneficiary is unable to ambulate.*
>> *(iii) The beneficiary is unable to sit in a chair or wheelchair.*

42 C.F.R. § 410.40(d)(1) (emphasis added).

24.     Subpart (d)(3) of Section 410.40 further provides that Medicare only "covers medically necessary nonemergency ambulance services that are either unscheduled or that are scheduled on a nonrepetitive basis"—like those at issue here—in circumstances including, among others:

> If the ambulance provider or supplier is unable to obtain a signed physician certification statement from the beneficiary's attending physician, a signed certification statement must be obtained from either the physician assistant (PA), nurse practitioner (NP), clinical nurse specialist (CNS), registered nurse (RN), or discharge planner, who has personal knowledge of the beneficiary's condition at the time the ambulance transport is ordered or the service is furnished. This individual must be employed by the beneficiary's attending physician or by the hospital or facility where the beneficiary is being treated and from which the beneficiary is transported.

*See* 42 C.F.R. § 410.40(d)(3)(iii).

25.     This certification requirement (the "Ambulance Certification Statement"), as the title of the regulation indicates, constitutes a "Special rule for nonemergency ambulance services that are either unscheduled or that are scheduled on a nonrepetitive basis."  *Id.*

26.     The Ambulance Certification Statement information submitted by NEMHS to the MAC and/or CMS relevant to this matter often were filled out and completed by MMC personnel, such as discharge planners or physician assistants.  This Ambulance Certification Statement information was a material consideration of the MAC and/or CMS when determining

whether to pay a claim, as such information had a natural tendency to influence, or be capable of influencing, the payment of federal Medicare monies.

27.     NEMHS' payment for the ambulance transport services at issue in this action were conditioned on information contained in MMC's Ambulance Certification Statements attesting that Medicare's medical necessity requirements were met. 42 C.F.R. § 410.40(d)(3)(v).

28.     For such reasons, "[i]n all cases, the provider or supplier must keep appropriate documentation on file and, upon request, present it to the contractor." 42 C.F.R. § 410.40(d)(3)(v). However, "[t]he presence of the signed certification statement or signed return receipt does not alone demonstrate that the ambulance transport was medically necessary. All other program criteria must be met in order for payment to be made." *Id.*

### C.     The False Claims Act

29.     The False Claims Act, at 31 U.S.C. § 3729(a)(1)(A), provides that a person is liable to the United States Government for three times the amount of damages which the Government sustains because of the act of that person, plus a civil penalty of between $10,781.40 and up to $21,562.80 for each such claim, for each instance in which the person "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."

30.     The False Claims Act also provides, at 31 U.S.C. § 3729(a)(1)(B), that a person is liable to the United States Government for three times the amount of damages that the Government sustains because of the act of that person, plus a civil penalty, for each instance in which the person "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." Records and statements are material to a false

or fraudulent claim where they have "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).

31.     The False Claims Act also establishes liability to the United States where an individual or entity "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."  31 U.S.C. § 3729(a)(1)(G).

32.     The False Claims Act defines the term "knowingly" under 31 U.S.C. § 3729(b)(1)(A) to mean that a person, with respect to information, "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information."

33.     Pursuant to 31 U.S.C. § 3729(b)(1)(B), no proof of specific intent to defraud is required.

## V.     Factual Background

### A.      Overview of False and Fraudulent Conduct

34.     NEMHS knowingly submitted or caused the submission of false claims to Medicare, and created false records and statements in order to receive funds from Medicare, for medically unnecessary ambulance transportation services rendered to MMC patients.

35.     NEMHS knowingly falsely certified the truthfulness and accuracy of electronic claim forms it submitted or caused to be submitted to Medicare for such services provided to MMC patients by creating and/or submitting documentation that falsely represented that patients were either bed-confined or that transportation by ambulance was otherwise medically required. An overwhelming number of such patients, however, were actually documented in NEMHS and MMC records available to NEMHS as being able to get up from their beds without assistance,

walk, and/or sit in a chair or wheelchair, and were not otherwise medically required to receive ambulance transports.

36.     These patients were therefore not "bed-confined," and did not otherwise require ambulance transportation or qualify for ambulance transportation under applicable Medicare rules.  Yet NEMHS sought and received payment for nonemergency ambulance transport services for these patients by submitting false claims to Medicare and creating false records and statements in order to receive funds from Medicare on the representation that the billed ambulance transports were medically necessary.

37.     NEMHS knew, deliberately ignored, and/or recklessly disregarded that the claims submitted to Medicare falsely described the condition of each patient on the specific day the patient was transported and were false or fraudulent because they did not accurately represent the physical condition of the patient on that day.

### B.     NEMHS is MMC's Primary Ambulance Provider

38.     NEMHS has provided, staffed, maintained, and operated ambulances and other medical transport vehicles on behalf of MMC under services agreements with MMC since October 23, 2007.  Under these services agreements, NEMHS has acted as MMC's primary ambulance and medical transportation provider for both routine and critical care patients transported from MMC since October 23, 2007.

39.     NEMHS was contractually obligated to provide, staff, maintain, and operate ambulances and other medical transport vehicles for both routine and critical care patients from MMC, and in some cases back to MMC, twenty-four hours a day, seven days per week, as requested by MMC.  NEMHS management was contractually obligated to attend quarterly quality assurance meetings with MMC.

40.     NEMHS holds the first option on all ambulance transports.  When ambulance transport services were needed from MMC, MMC sought to use NEMHS for all transports in the first instance.  Only when NEMHS was unavailable did MMC use other ambulance services.

**C.     NEMHS Staff Liaises with MMC Personnel to Arrange Nonemergency Ambulance Transports**

41.     Since at least 2009, a dedicated NEMHS staff member has been physically stationed at MMC to float between MMC's departments, and has been referred to by NEMHS and MMC alike as the ambulance transport "Liaison Officer."

42.     The NEMHS Liaison Officer consulted on and arranged all NEMHS ambulance transports from MMC on MMC's behalf.

**D.     NEMHS Offers Trainings to MMC on the "Medical Necessity" of Nonemergency Ambulance Transports**

**1.     The June 2010 Training**

43.     MMC personnel received training on ambulance transport payment, medical necessity, and Ambulance Certification Statements provided by NEMHS on at least two occasions.

44.     On June 30, 2010, NEMHS' Vice President of Business Development gave a presentation at MMC to MMC staff entitled, "Medical Transportation—What is it and Who Pays for What."

45.     NEMHS' Vice President of Business Development had no medical training or experience, but rather, was responsible for building NEMHS' business relationships.

46.     The June 30, 2010 presentation indicated that NEMHS' Vice President of Business Development was a "Certified Senior Advisor" (a "CSA").  The CSA certification, however, is a professional credential certifying that an individual possesses a multi-disciplinary

11

knowledge of the aging process and aging issues, rather than a certification concerning paramedic or ambulance services.

47.    The presentation stated that ambulance service is generally covered under Medicare Part B.

48.    As an example of what "Medicare Won't Pay for," the presentation stated "Medicare Never pays for Wheelchair."

49.    Later in the presentation it was emphasized, "REMINDER Medicare NEVER pays for Wheelchair van service."

50.    The presentation provided that both reasonableness and medical necessity must be in place in order for Medicare to pay for ambulance transportation.

51.    Regarding medical necessity, the presentation stated:

> Medical Necessity - is established when patients cannot be transported by any other means without endangering their health. If the patient could be moved by any other means other than an ambulance, such as by wheelchair van, car, taxi, etc. then medical necessity does not exist. It doesn't matter if other transportation isn't actually available.

52.    The presentation provided as an example of the medical necessity requirement, "was bed confined before or after trip."

### 2.    The June 2011 Training

53.    On June 29, 2011, NEMHS' Vice President of Business Development and its Liaison Officer gave a 20-minute presentation at MMC to MMC personnel to "provide updates regarding medical necessity."

54.    NEMHS' presentation noted that Medicare audits in the ambulance industry had tripled over the past two years, and that such audits of hospital discharges had focused primarily

on the concept of medical necessity and whether the patient's medical condition required

transport by ambulance.

55.     The presentation provided the definition of "bed-confinement" under 42 C.F.R. §

410.40(d)(1)(i)-(iii).

56.     The presentation noted that NEMHS' ambulance staff were required to

thoroughly document each transport.

57.     The presentation identified the following problem:

> PROBLEM:  The documentation of our staff is sometimes in
> conflict with the information contained on the PCS [Ambulance
> Certification Statements, also known as the physician certification
> statement].

58.     "We need the Medical Necessity Form and what the patients' actual condition is

to correlate," the presentation stated.

59.     "The Medical Necessity forms are used in collaboration with the Patient Care

Reports from the EMTs and Paramedics to bill the insurance company," the presentation stated.

60.      "If they can safely sit in a wheelchair for transport then they do not need to go by

ambulance," the presentation stated.

### 3.     The 2014 CMS MAC Training

61.     On September 17, 2014, MMC's Director of Care Management organized a

training session for MMC staff run by CMS MAC National Government Services, Inc., which

focused on medical necessity and Ambulance Certification Statements.

62.     The presentation was delivered by National Government Services, Inc.'s Provider

Outreach & Education staff, and was entitled "Ambulance Medical Necessity."  Covered by the

presentation were the definition of medical necessity, examples of medical necessity, the

definition of "bed-confined," and examples of bed confinement.  Also stressed by the presentation were the requirements of the Ambulance Certification Statements.

63.   No NEMHS personnel attended the CMS MAC training.

64.   Following the CMS MAC training, MMC employees informed NEMHS' former Liaison Officer that he had been providing instruction concerning medical necessity and Ambulance Certification Statements which was different from the information provided at the training session.  MMC staff told the Liaison Officer that he had been advising that transports were medically necessary which the CMS MAC training indicated were not medically necessary.

65.   NEMHS' former Liaison Officer shared the MMC employees' concerns with NEMHS' Vice President of Business Development.

66.   NEMHS' Vice President of Business Development responded to NEMHS' former Liaison Officer by telling him that she would look into it and get back to him.

67.   When NEMHS' Vice President of Business Development got back to NEMHS' former Liaison Officer she told him that the instruction he had been providing was correct and that he should continue doing what he had been doing.

**E.    The MMC Ambulance Certification Statements Used by NEMHS Did Not Support Ambulance Transports**

68.   Each ambulance transport NEMHS billed to Medicare was supported by an Ambulance Certification Statement filled out by MMC personnel or an MMC contractor.

69.   The Ambulance Certification Statements themselves originated from, and were created and updated by, members of NEMHS' management, billing, and education departments.

70.   Many of the Ambulance Certification Statements from November 2010 onward stated:

> I certify that the above information is true and correct based on my evaluation of this patient, and represent that the patient requires transport by ambulance and

> that other forms of transport are contraindicated.  I understand that this
> Information will be used by the Centers for Medicare and Medicaid Services
> (CMS) to support the determination of medical necessity for ambulance services,
> and I represent that I have personal knowledge of the patient's condition at the
> time of transport.

Earlier versions of the Ambulance Certification Statements similarly contained language that the MMC signatory was "familiar with the patient conditions, has reviewed the above certification and has determined that ambulance transportation is medically necessary for the reasons above."

71.     This language was removed from the form Ambulance Certification Statements on or about October 2014.

72.     Further, the definition of "bed-confinement" under 42 C.F.R. § 410.40(d)(1)(i)-(iii) has been in effect, without change, since the beginning of 2010.  To be considered bed-confined, the beneficiary must be: (i) "unable to get up from bed without assistance." (ii) "unable to ambulate." (iii) "unable to sit in a chair or wheelchair."

73.     Prior to November 2010, however, the Ambulance Certification Statements incorrectly altered the "unable to ambulate" requirement of 42 C.F.R. § 410.40(d)(1)(ii) by changing the language to "unable to ambulate ***without assistance***."

74.     Changing "unable to ambulate" to "unable to ambulate without assistance" significantly and improperly expanded the definition of bed-confinement.  Qualifying "unable to ambulate" by inserting the "without assistance" language made it easier to indicate that patients were bed-confined.  Under the actual language of the regulation, a patient is only bed-confined if she cannot walk at all.  Under the altered language, patients are "bed-confined" even when they ambulated with the assistance of a walker, cane, or help from MMC staff.  Those patients who ambulated with the assistance of a walker, cane, or help from MMC staff, however, were not "unable to ambulate" under the actual text of the regulation.

75.     Various versions of Ambulance Certification Statements with the above qualified language were utilized by MMC and NEMHS throughout at least 2011, including versions with created time stamps of September 10, 2007, October 21, 2009, November 24, 2009, and January 11, 2010.

76.     A form Ambulance Certification Statement with the proper 42 C.F.R. § 410.40(d)(1) language was only first developed by NEMHS in November 2010.

**F.      Specific Examples of False and Fraudulent Conduct**

77.     MMC ordered—and NEMHS provided, billed, and was paid for—nonemergency ambulance transports for certain kinds of patients who did not medically require ambulance transports.

78.     Through 2012, in particular, the majority of patients who were discharged from MMC to a skilled nursing facility following total knee replacement surgery were transported by ambulance.

79.     Many of these patients, however, were walking just hours after having their surgeries, able to get up from bed without assistance, able to sit in a chair or wheelchair, and were not otherwise contraindicated for transport by wheelchair van or car.

80.     As a general practice, MMC total knee replacement surgery patients were transported by ambulance through at least 2012.  MMC personnel have subsequently acknowledged that many of the patients could have been transported by wheelchair van or car and did not need to be transported by ambulance.

81.     NEMHS knowingly submitted bills to Medicare for medically unnecessary ambulance transports of knee replacement patients, and received such payment as a result.  Each such claim was made by NEMHS through its submission of a CMS-1500 form, by which

16

NEMHS falsely certified that the ambulance transport services in question were "medically indicated and necessary for the health of the patient." All such claims were also supported by information from Ambulance Certification Statements made by MMC, which certified the medical necessity of the nonemergency ambulance services in question.

82. For 2010 through 2012, a total of 949 patients were discharged from MMC following total knee replacement surgeries; 366 were discharged to skilled nursing facilities, and another 434 were discharged to home health care.

83. The vast majority of these total knee replacement patients were transported approximately 10 to 20 minutes by NEMHS via ambulance, did not meet the medical necessity requirements for ambulance transfer, and could have been transported either by wheelchair van or car. Such patients had comments in their medical records confirming that they were capable of sitting up for periods of time, either for meals, relaxing in their rooms, or while resting during or after physical therapy. Many were documented as walking. Examples of NEMHS' false claims include but are not limited to the following total knee replacement patients.

84. **_FC Patient 1._** FC Patient 1 was transported between MMC and St. Joseph's Manor in Portland on two separate occasions in July 2010.

85. NEMHS arrived at MMC on the first occasion on July 15, 2010, after FC Patient 1 had undergone a right knee replacement. According to the NEMHS Patient Care Report, FC Patient 1 was found sitting in her chair, and was alert, oriented, and cooperative. An MMC nurse stood FC Patient 1 up and walked approximately 10 feet with her over to the stretcher. The MMC nurse stated that FC Patient 1 was fine to walk and had been walking on her own during her admission. FC Patient 1 was nonetheless transferred to a stretcher and moved to the ambulance for transport. The MMC Ambulance Certification Statement indicated that FC

Patient 1 was "bed-confined."  NEMHS submitted a claim for payment of $424.00 to Medicare under CPT codes A0425, A0428, and A0999, and was paid $201.56 by Medicare on July 23, 2010.  NEMHS falsely and fraudulently certified on its CMS-1500 form that the ambulance transport services in question had been "medically indicated and necessary for the health of the patient."

86.     NEMHS arrived at St. Joseph's Manor to transport FC Patient 1 back to MMC a week later, on July 22, 2010, for a left knee replacement.  According to the NEMHS Patient Care Report, FC Patient 1 was found sitting on the edge of her bed, and denied having any pain or discomfort.  FC Patient 1 then stood and walked to the stretcher using her walker.  When FC Patient 1 arrived at MMC by ambulance, she walked to her hospital bed using her walker.   Yet the Ambulance Certification Statement again indicated that FC Patient 1 was "bed-confined." NEMHS submitted a claim for payment of $389.00 to Medicare under CPT codes A0425, A0428, and A0999, and was paid $185.06 by Medicare on August 6, 2010.  NEMHS falsely certified on its CMS-1500 form that the ambulance transport services in question had been "medically indicated and necessary for the health of the patient."

87.     *FC Patient 2.*  FC Patient 2 was transported from MMC to Cedars Nursing Care Center in Portland on May 14, 2011.  NEMHS arrived at MMC after FC Patient 2 had undergone a right knee replacement.  According to the NEMHS Patient Care Report, MMC staff stated that FC Patient 2 had been walking with a walker.  FC Patient 2 stated to NEMHS staff that the only complaint she had was pain of 4 out of a scale of 10 in her right knee when she rested and elevated it.  She stated the pain was diminished *upon walking*.  The MMC Ambulance Certification Statement did not indicate that the patient was bed-confined, but instead listed as the reason FC Patient 2 could not be transported by wheelchair van as "unable," with no further

18

discussion.  NEMHS falsely and fraudulently submitted a claim for payment of $428.80 to Medicare under CPT codes A0425, A0428, and A0999, and was paid $197.43 by Medicare on May 23, 2011.  NEMHS falsely certified on its CMS-1500 form that the ambulance transport services in question had been "medically indicated and necessary for the health of the patient."

88.     Total knee replacement patients were not the only patient population for which NEMHS' submitted false claims and MMC Ambulance Certification Statements.  Examples of NEMHS' false claims and false certifications covered a broad variety of other patients, including but not limited to the following.

89.     ___FC Patient 3.___  FC Patient 3 was transported from MMC to New England Rehabilitation Hospital in Portland on August 30, 2010.  NEMH arrived at MMC after FC Patient 3 had been treated for a subdural hematoma and a shoulder bruise.  According to the NEMH Patient Care Report, FC Patient 3 was found sitting in his bed, calm and cooperative, and was alert and oriented.  FC Patient 3 had no complaints.  An MMC nurse informed the NEMH staff that FC Patient 3 was stable and able to transfer himself from his bed to his stretcher.  The MMC Ambulance Certification Statement, however, indicated that the patient was "bed-confined."  NEMH falsely and fraudulently submitted a claim for payment of $369.00 to Medicare under CPT codes A0425, A0428, and A0999, and was paid $185.06 by Medicare on October 27, 2010.  NEMH falsely certified on its CMS-1500 form that the ambulance transport services in question had been "medically indicated and necessary for the health of the patient."

90.     ___FC Patient 4.___  FC Patient 4 was transported from MMC to New England Rehabilitation Hospital in Portland on November 15, 2011.  NEMHS arrived at MMC after FC Patient 4 had been seen for chest pressure.  According to the NEMHS Patient Care Report, the "PT WAS FOUND IN A CHAIR READY TO GO ABLE TO STAND AND WALK WITH

WALKER TO STRETCHER IN NO PAIN."  FC Patient 4 was transported to New England

Rehabilitation Hospital and, upon arrival, "AGAIN ABLE TO STAND AND WALK TO CARE

GIVERS CHAIR."  The MMC Ambulance Certification Statement, however, indicated that FC

Patient 4 was "very debilitated."  NEMHS falsely and fraudulently submitted a claim for

payment of $373.80 to Medicare under CPT codes A0425 and A0428, and was paid $183.71 by

Medicare on December 27, 2011.  NEMHS falsely certified on its CMS-1500 form that the

ambulance transport services in question had been "medically indicated and necessary for the

health of the patient."

91.      *FC Patient 5.*  FC Patient 5 was transported from MMC to Thayer Hospital in

Waterville on July 18, 2012.  NEMHS arrived at MMC after FC Patient 5 had been seen for

cardiac complications.  According to the NEMHS Patient Care Report, NEMHS personnel found

FC Patient 5 "SITTING IN CHAIR, NOT HOOKED UP TO ANY INTERVENTIONS, READY

TO GO. PT TRANSFERRED TO STRETCHER VIA STAND AND PIVOT WHILE I HELD

HAND FOR STABILIZATION."  In the ambulance FC Patient 5's "VITAL SIGNS ALL

GOOD, PATIENT HAS NO COMPLAINTS OF PAIN, OR WEAKNESS. STATES FEELING

VERY GOOD."  He "WAS ABLE TO AMBULATE AT HOSPITAL WITH WALKER.

STATES HE WAS A SMOKER, BUT NOW PLANS TO QUIT AFTER THIS EPISODE."  The

MMC Ambulance Certification Statement, however, indicated that the patient was "bed-

confined."  NEMHS falsely and fraudulently submitted a claim for payment of $1,450.80 to

Medicare under CPT codes A0425 and A0428, and was paid $612.12 by Medicare on August 22,

2012.  NEMHS falsely certified on its CMS-1500 form that the ambulance transport services in

question had been "medically indicated and necessary for the health of the patient."

20

G.     **NEMHS' Reverse False Claims from 2012 to the Present**

1.     **Applicable law concerning section 3729(a)(1)(G) reverse false claims**

92.     In addition to the foregoing false claims, NEMHS is also liable for reverse false claims because it "knowingly conceal[ed] or knowingly and improperly avoid[ed] or decrease[d] an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G).

93.     "Obligation" is defined as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." *Id.* at § 3729(b)(3).

94.     Section 6402(a) of the Patient Protection and Affordable Care Act of 2010 (Enhanced Medicare and Medicaid Program Integrity Provisions), Pub. L. No. 111-148, 124 Stat. 119, 753-56 (2010), amended the Social Security Act with a provision that addresses what constitutes an overpayment under the False Claims Act in the context of a federal health care program. Under the section, an overpayment is defined as "any funds that a person receives or retains under [Title] XVIII or XIX to which the person. . . is not entitled." *See* 42 U.S.C. § 1320a-7k(d)(4)(B).

95.     An "overpayment must be reported and returned" within "60 days after the date on which the overpayment was identified." *Id.* § 1320a-7k(d)(2); *see also* 42 C.F.R. §§ 401.305(a)(1), (d)(1)-(2). "Any overpayment retained . . . after the [60-day] deadline . . . is an obligation (as defined in section 3729(b)(3) of title 31) for purposes of section 3729 of such title." *Id.* § 1320a-7k(d)(3); *see also* 42 C.F.R. §§ 401.305(b)(1), (e), (f).

96.     Overpayment obligations are "identified" for purposes of the 60-day rule "when the person has, or should have through the exercise of reasonable diligence, determined that the

person has received an overpayment and quantified the amount of the overpayment." 42 C.F.R. §§ 401.305(a)(2), (e), (f). "A person should have determined that the person received an overpayment and quantified the amount of the overpayment if the person fails to exercise reasonable diligence and the person in fact received an overpayment." 42 C.F.R. § 401.305(a)(2).

97.     "Reasonable diligence" requires both: (i) proactive compliance activities conducted in good faith by qualified individuals to monitor for the receipt of overpayments; and (ii) reactive investigations conducted in good faith and in a timely manner by qualified individuals in response to obtaining credible information of a potential overpayment. *See* Medicare Program; Reporting and Returning Overpayments, 81 Fed. Reg. 7661 (Feb. 12, 2016). Undertaking no or minimal compliance activities to monitor the accuracy and appropriateness of Medicare claims is grounds for provider liability based on failure to exercise reasonable diligence that overpayments have been received. *Id.*

98.     Any retained overpayments for the preceding six years thus constitute "obligations" for purposes of 31 U.S.C. § 3729(a)(1)(G). *See* 42 C.F.R. §§ 401.305(e), (f). Failure to return such overpayments constitutes "reverse false claims" actionable under 31 U.S.C. § 3729(a)(1)(G).

### 2.     NEMHS' specific reverse false claims

99.     Since at least 2012, NEMHS has knowingly retained overpayments of Medicare funds to which it was not entitled by failing to report and return such funds within 60 days after the date on which the overpayments were identified. NEMHS identified such reverse false claims both by: (i) failing to exercise reasonable diligence owing to its lack of compliance activities to monitor the accuracy and appropriateness of its Medicare claims; and (ii) actually

22

flagging and quantifying overpayments it received that needed to be refunded back to Medicare, but failing to do so.

100.    As a baseline for compliance, the services contracts between NEMHS and MMC required the companies' management to attend quarterly quality assurance meetings.  However, no such meetings were held.

101.    Prior to and through 2012, NEMHS made available to its ambulance crews a "Medicare Inquiry Form."  The Medicare Inquiry Form was to be completed and promptly turned in to an NEMHS supervisor or manager for review whenever compliance questions or issues arose concerning the appropriateness or legality of an ambulance transport billed to Medicare.  Upon review of a Medicare Inquiry Form, a "Billing Inquiry Resolution Form" was supposed to be filled out by NEMHS management to memorialize the "action taken," including whether medical necessity was absent and the claim to Medicare should be denied, cancelled or refunded.

102.    NEMHS management stopped generating Billing Inquiry Resolution Forms responsive to its ambulance crews' Medicare Inquiry Forms in 2013.  In 2014, the Billing Inquiry Resolution Forms also were not utilized.

103.    Prior to 2012, NEMHS held internal monthly "Medicare Post-Submission Audit" meetings of a compliance committee comprising certain members of its management team and an outside auditor.  Of the approximately 1,500 to 2,000 ambulance transports performed by NEMHS in any given month, the outside auditor would himself review between 90 and 120.  Of these, NEMHS' outside auditor would elevate roughly 5 to 10 ambulance transports to the larger compliance committee for its review.

104.     In 2011, for example, NEMHS' compliance committee reviewed roughly seven ambulance transports per month.  Following each monthly review, the compliance committee would identify one to three ambulance transports which needed to be "refunded" to Medicare for various reasons, such as lack of medical necessity or lack of bed-confinement.  NEMHS made 28 such refunds as a result of its compliance committee meetings in 2011.

105.     Using this actual 2011 refund figure, NEMHS further calculated an "extrapolated projected refunds" figure applicable to the larger universe of claims payments it received in 2011.  For 2011, NEMHS projected the existence of an additional 421 refunds due to Medicare.

106.     For January 2012, the compliance committee reviewed ten ambulance transports elevated by NEMHS' outside auditor.  The compliance committee determined that eight of these ten ambulance transports needed to be refunded.  These eight refunds were ultimately made by NEMHS to Medicare.

107.     Regarding the broader universe of January 2012 transports for which Medicare payments were received, NEMHS' outside auditor conveyed to NEMHS management that the runs raised issues requiring further review by the compliance committee to determine whether or not they had been appropriately billed.

108.     For February 2012, the compliance committee reviewed another ten ambulance transports NEMHS' outside auditor had elevated.  Regarding the broader universe of February 2012 transports for which Medicare payments were received, NEMHS' outside auditor conveyed to NEMHS management that an emphasis needed to be placed on developing better methods of educating NEMHS' staff and ambulance crews.

109.     Of the ten February 2012 ambulance transports reviewed, NEMHS' compliance committee determined that the following seven needed to be refunded to Medicare: NEMHS Run

24

#7753 for ***RFC Patient 1***, covering ambulance services provided on February 5, 2012 for which NEMHS received payment; NEMHS Run #8305 for ***RFC Patient 2***, covering ambulance services provided on February 8, 2012 for which NEMHS received payment; NEMHS Run #8472 for ***Patient RFC 3***, covering ambulance services provided on February 8, 2012 for which NEMHS received payment; NEMHS Run #10598 for ***RFC Patient 4***, covering ambulance services provided on February 17, 2012 for which NEMHS received payment; NEMHS Run #11031 for ***RFC Patient 5***, covering ambulance services provided on February 21, 2012 for which NEMHS received payment; NEMHS Run #11145 for ***RFC Patient 6***, covering ambulance services provided on February 21, 2012 for which NEMHS received payment; and NEMHS Run #125643 for ***RFC Patient 7***, covering ambulance services provided on February 28, 2012 for which NEMHS received payment.

110.    However, after both determining and quantifying its receipt of these overpayments, NEMHS failed to timely report and return such funds as required.  To date, NEMHS continues to retain these February 2012, and other, overpayments.

111.    Furthermore, beginning March 2012, NEMHS suspended its monthly Medicare Post-Submission Audit meetings.  Such meetings were held infrequently, or not at all, throughout the remainder of 2012, all of 2013, and all of 2014.

112.    Coinciding with NEMHS' cessation of monthly compliance meetings, no refunds were paid back to Medicare by NEMHS for ambulance transports from February 2012 onward. NEMHS did not pay any refunds back to Medicare for ambulance transports for the entirety of 2013.  NEMHS did not resume paying refunds back to Medicare for ambulance transports until late 2014.  During the same time frame, NEMHS' ambulance personnel nonetheless continued to determine and quantify the receipt of overpayments for improperly billed ambulance transports.

113.    On July 14, 2012, NEMHS transported **_RFC Patient 8_** from MMC via ambulance for a trip of approximately 2.3 miles (NEMHS Run #43339) and received $190.32 in Medicare payments for such transport.  However, NEMHS personnel observed on a Medicare/MaineCare Inquiry Form submitted to NEMHS management that same day that the service requested may not have been covered by Medicare because the patient "was able to ambulate . . . and had to use [a] stair chair [at her] residence."  NEMHS never refunded this $190.32 payment to Medicare.

114.    On January 25, 2013, NEMHS transported **_RFC Patient 9_** from MMC via ambulance for a trip of approximately 1.9 miles (NEMHS Run #5709) and received $189.02 in Medicare payments for such transport.  However, NEMHS personnel observed on a Medicare/MaineCare Inquiry Form submitted to NEMHS management that same day that the patient did not appear to require the service requested because she "was told she was going by [wheelchair and] could walk and sit."  NEMHS never refunded this $189.02 payment to Medicare.

115.    On August 22, 2013, NEMHS transported **_RFC Patient 10_** from MMC via ambulance for a trip of approximately 3.4 miles (NEMHS Run #52638) and received $201.36 in Medicare payments for such transport.  However, NEMHS personnel observed on a Medicare/MaineCare Inquiry Form submitted to NEMHS management that same day that the MMC nurse had informed NEMHS ambulance transport personnel that "she [had] requested a wheelchair van."  NEMHS never refunded this $201.36 payment to Medicare.

116.    On December 7, 2014, NEMHS transported **_RFC Patient 11_** from MMC via ambulance for a trip of approximately 4.4 miles (NEMHS Run #82276) and received $193.41 in Medicare payments for such transport.  However, NEMHS personnel observed on a Medicare/MaineCare Inquiry Form submitted to NEMHS management that same day that the

MMC nurse "would not sign [the medical necessity certificate]" and that the patient "could have done a car service or wheel chair" van.  NEMHS never refunded this $193.41 payment to Medicare.

117.    NEMHS' reverse false claims also pre- and post-date the period during which it suspended its compliance activities.  On September 26, 2011, NEMHS transported **_RFC Patient 12_** from MMC via ambulance (NEMHS Run #37227) and received $421.34 in Medicare payments for such transport.  However, NEMHS personnel observed on November 3, 2011 that it did not seem medically necessary for the patient to be transported by ambulance, that MMC's certification was insufficient, and that the compliance committee's review was required.  On February 13, 2012 NEMHS determined that the ambulance transport was not medically necessary and that $421.34 payment should be refunded to Medicare.  NEMHS never refunded this $421.34 payment to Medicare.  As recently as January 27, 2016, NEMHS transported **_RFC Patient 13_** from MMC via ambulance (NEMHS Run #4684) and received $180.79 in Medicare payments for such transport.  However, on February 24, 2016 NEMHS determined that the $180.79 payment should be refunded to Medicare because the patient walked, was alert and oriented times four, and was going home.  NEMHS never refunded this $180.79 payment to Medicare.

118.    NEMHS failed to timely report and return such funds as required.

119.    NEMHS' failure to return such overpayments therefore constitutes "reverse false claims" actionable under 31 U.S.C. § 3729(a)(1)(G).

## Count I:  False or Fraudulent Claims

### (31 U.S.C. §§ 3729(a)(1)(A), 3730(a))

120.    Paragraphs 1 through 119 are realleged as though fully set forth herein.

121.    Defendant, by and through its requests for payment, knowingly submitted or caused to be submitted false or fraudulent claims for payment or approval in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A), and thereafter received payments on such false or fraudulent claims.

122.    Because of Defendant's acts, the United States sustained damages in an amount to be determined at trial, and therefore is entitled to treble damages under the False Claims Act, plus civil penalties of not less than $10,781.40 and up to $21,562.80 for each violation.

## Count II:  False Records or Statements

### (31 U.S.C. §§ 3729(a)(1)(B), 3730(a))

123.    Paragraphs 1 through 122 are realleged as though fully set forth herein.

124.    Defendant knowingly made, used, or caused to be made or used false records or statements material to NEMHS' false or fraudulent claims, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

125.    Defendant violated 31 U.S.C. § 3729(a)(1)(B) with respect to its creation and use of false CMS-1500 claims forms certifying that the ambulance transport services in question were "medically indicated and necessary for the health of the patient" when they were not.

126.    Because of NEMHS' acts, the United States sustained damages in an amount to be determined at trial, and therefore is entitled to treble damages under the False Claims Act, plus civil penalties of not less than $10,781.40 and up to $21,562.80 for each violation.

## **Count III: Reverse False Claims**

(31 U.S.C. §§ 3729(a)(1)(G), 3730(a))

127.    Paragraphs 1 through 126 are realleged as though fully set forth herein.

128.    NEMHS knowingly concealed, avoided, or decreased an obligation to pay or transmit money to the United States, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G) and (b)(3).

129.    Because of Defendant's acts, the United States sustained damages in an amount to be determined at trial, and therefore is entitled to treble damages under the False Claims Act, plus civil penalties of not less than $10,781.40 and up to $21,562.80 for each violation.

## **Count IV: Unjust Enrichment**

(Common Law)

130.    Paragraphs 1 through 129 are realleged as though fully set forth herein.

131.    Defendant was unjustly enriched through the payments it received from Plaintiffs' funds.  The circumstances of Defendant's receipt of those payments are such that, in equity, Defendant is liable to account for and pay such amounts, which are to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff the United requests that judgment be entered in its favor and against Defendant as follows:

A.    On Counts One and Two (Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A) and (B)) against Defendant, for treble the United States' damages, in an amount to be determined at trial, plus civil penalties for each false claim presented, together with all such relief as may be just and proper;

B.      On Count Three (Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G)) against Defendant, for treble the United States' damages, in an amount to be determined at trial, plus civil penalties for each false claim presented, together with all such relief as may be just and proper;

C.      On Counts One, Two and Three, an award of costs pursuant to 31 U.S.C. § 3729(a) as against Defendant;

D.      On Count Four (Unjust Enrichment), for an accounting and for the amounts by which Defendant was unjustly enriched, in an amount to be determined at trial, together with costs and interest; and

E.      All other relief this Court deems just and proper.

## DEMAND FOR JURY TRIAL

The United States demands a jury trial in this case pursuant to Federal Rule of Civil Procedure 38(b) of all claims and issues so triable.


Dated: February 23, 2018                Respectfully submitted,
       Portland, Maine

                                 HALSEY B. FRANK
                                 United States Attorney

                                 /s/ Andrew K. Lizotte
                                 Andrew K. Lizotte
                                 Assistant U.S. Attorney
                                 100 Middle Street, East Tower, 6th Floor
                                 Portland, Maine 04101
                                 (207) 780-3257
                                 Andrew.Lizotte@usdoj.gov